UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ANDREW TARANTINO, JR., | No. C 03-03450 MHP |
| Plaintiff, | |
| v. | **MEMORANDUM & ORDER**<br>**Re: Motions for Summary Judgment** |
| STEVE SYPUTO, RON ACE, CODY HARRISON, TONY HUNLEY, SHAWN SPENCER, KRISTINA CHAMPAGNE, SHERRY R. RUBIO, MARIA BATTERTON, BYRICH CORP, CITY OF CONCORD, and MICHAEL RHODES, | |
| Defendants. | |

Plaintiff Richard Andrew Tarantino, Jr. filed this action on July 24, 2003, complaining of various civil rights and constitutional violations arising out of the seizure of vehicles from plaintiff's property and alleged further harassment by defendants. Now before the court are four motions for summary judgment. The first is filed by plaintiff. The second is filed by defendants Syputa[1], Ace, Harrison, Hunley, Spencer and Champagne (the "city defendants"). The third is filed by defendants Batterton, Rubio and Rhodes[2]. The fourth is filed by defendant Bryrich Corp. (collectively, with defendants Batterton, Rubio and Rhodes, the "towing company defendants"). Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

1

BACKGROUND[3]

Plaintiff is the owner of the property at 1650 Denkinger Road in Concord, California (the "property"). During the period of time relevant to this lawsuit, plaintiff stored a number of cars, trucks and boats—some of which were unregistered or nonfunctional—in various locations on his property. The vehicles at issue in this lawsuit were stored on the unenclosed driveway and paved area located in front of his house, adjacent to the public sidewalk and street. See Declaration of Kristina Champagne in Support of Defendants' Motion for Summary Judgment ("Champagne Dec."), Exh. H.

On December 16, 2002 one of plaintiff's neighbors contacted defendant City of Concord to complain about the cars and trucks stored in plaintiff's yard. Id. ¶ 5. In response to the complaint, defendant Champagne visited plaintiff's property and noted the presence of an unregistered 1952 Ford pickup truck on plaintiff's driveway. Id. ¶ 6. The City of Concord mailed plaintiff a letter on December 19, 2005 stating that the storage of the unregistered truck on plaintiff's driveway violated Concord Municipal Code section 62-166. The letter requested that plaintiff register the truck or remove it from his property.

On December 30, 2002 Champagne returned to plaintiff's property and observed that the truck remained unregistered and stored on plaintiff's driveway. The city sent a second letter on December 31, 2002 threatening to commence abatement proceedings on January 10, 2003 if plaintiff failed to correct the violation.

On January 17, 2003 the city sent plaintiff a third letter, informing him that the city would proceed with the abatement of the truck within ten days unless plaintiff corrected the violation. Id. ¶ 9. The January 17 letter notified plaintiff that he had a right to a hearing on the planned abatement, provided that he responded in writing within ten days. Plaintiff did not respond to any of the city's three letters.

The city abated plaintiff's truck on January 31, 2003. Id. ¶ 12. One of the towing company defendants performed the actual removal, which was supervised by Concord police officers. Id.; Declaration of Steve Syputa in Support of Defendants' Motion for Summary Judgment ("Syputa Dec.") ¶ 6. Plaintiff verbally and physically resisted the abatement. Id. ¶ 8. According to plaintiff,

2

the officers supervising the abatement threatened plaintiff with arrest, laughed at plaintiff, claimed to be "above the law," and vowed to return to take away more cars. Declaration of Richard Andrew Tarantino in Support of Plaintiff's Motion for Summary Judgment ("Tarantino Dec.") ¶¶ 5–8.

Responding to another complaint lodged with the city on April 3, 2003, the city abated two additional vehicles—a 1956 pickup truck and a 1968 Mustang—following similar pre-abatement communications, on April 29, 2003. All of the three abated vehicles were unregistered, and at least one vehicle—the Mustang—lacked a battery or transmission. Declaration of Mark S. Coon in Support of Defendants' Motion for Summary Judgment ("Coon Dec."), Exh. A.

The city also inspected plaintiff's property for building code violations, ostensibly in response to the same neighbor complaint which prompted the April 29, 2003 abatement. Defendant Champagne observed plaintiff's property from the street and noted several unpermitted modifications to plaintiff's residence. Champagne Dec. ¶¶ 18–20. Pursuant to a subsequently obtained general inspection warrant, Champagne investigated the remainder of plaintiff's property. According to Champagne, plaintiff's property contained numerous other unregistered or nonfunctional vehicles, boats, and construction debris. Id. ¶¶ 23–25.

The city issued a third abatement order on October 23, 2003, ordering plaintiff to correct the violations identified in Champagne's inspections. After plaintiff failed to comply, the city obtained a permanent injunction in state court, declaring plaintiff's property to be a nuisance. Coon Dec., Exh. E. The injunction required plaintiff to correct each of the violations noted by Champagne, including the removal of all "inoperable vehicles" located out-of-doors on the property. Id. at 2.

Plaintiff filed this lawsuit alleging that defendants' acts violated various of his federal constitutional and state law rights.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is

3

1  genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving
2  party. Id. The party moving for summary judgment bears the burden of identifying those portions
3  of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of
4  material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the
5  opposing party will have the burden of proof at trial, the moving party need only point out "that
6  there is an absence of evidence to support the nonmoving party's case." Id.

7  Once the moving party meets its initial burden, the nonmoving party must go beyond the
8  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a
9  genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving
10 party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir.
11 1994). The court may not make credibility determinations, and inferences to be drawn from the
12 facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New
13 Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

14 The moving party may "move with or without supporting affidavits for a summary judgment
15 in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing
16 affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in
17 evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated
   therein." Fed. R. Civ. P. 56(e).

19 DISCUSSION
20 Plaintiff's First Amended Complaint states twelve claims against various defendants. For
21 purposes of resolving the instant motions, it is helpful to divide the claims into four groups.
22 The first group comprises claims that defendants' seizures of plaintiff's three vehicles
23 without a warrant were in violation of the Fourth Amendment as applied to the states through the
24 Fourteenth Amendment (plaintiff's "Fourth Amendment claims"). Falling into the first group are
25 claims 1, 4, and 6, which pertain to the towing of the three vehicles; claims 2 and 7, which pertain to
26 plaintiff's efforts to prevent the vehicles from being towed away, and claim 11, which attempts to
27 extend liability for the allegedly unlawful seizures to the City of Concord.[4]

4

The second group consists of claims that the abatement of plaintiff's vehicles violated the Due Process Clause of the Fourteenth Amendment because Concord's abatement statute is unconstitutionally vague and because plaintiff was allegedly denied any pre-deprivation or post-deprivation hearing (plaintiff's "Due Process claims"). Falling into the second group are claims 3, 5 and 8, which correspond to the seizures of the three vehicles.

The third group consists of claim 12, which alleges that defendant Champagne unlawfully retaliated against plaintiff by initiating the inspection of plaintiff's property for building code violations and for unlawful storage of debris (plaintiff's "retaliation claim").

The final group consists of claims 9 and 10, which are state law intentional infliction of emotional distress and conversion claims (plaintiff's "state law claims").

The court will consider each group of claims in turn.

I.   Fourth Amendment Claims
    A.   Merits of Plaintiff's Fourth Amendment Claim
        1.   Violation of the Abatement Statute

Defendants claim that plaintiff's vehicles were properly abated because they were "inoperative" under CMC section 62-166. Section 62-166 provides, in full, as follows:

> It shall be a misdemeanor pursuant to section 1-23 of this Code for any person to abandon, park, store, or leave or permit the abandonment, parking, storing, or leaving of any licensed or unlicensed vehicle, or part thereof, which is in an abandoned, wrecked, dismantled, or inoperative condition, upon any private property or public property, not including highways. An abandoned vehicle is any vehicle, defined in Vehicle Code § 670, which has been left on private property or on public property other than highways in such inoperable or neglected condition that the owner's intention to relinquish all further rights or interests in it may be reasonably concluded.

According to defendants, vehicles lacking valid registration are "inoperative" because they cannot legally be driven.

In support of their argument, defendants cite City of Costa Mesa v. Soffer, 11 Cal. App. 4th 378 (1992). In Soffer, the Court of Appeal rejected an overbreadth challenge to an abatement statute which defined "inoperative" to mean, *inter alia*, "[p]rohibited from being operated on a public street or highway pursuant to [various Vehicle Code sections] concerning license plates, registration,

5

equipment, safety and related matters." Id. at 386 n.8. Unlike the statute in Soffer, however, the Concord statute does not expressly define "inoperative." The reasoning in Soffer is therefore not helpful.

Turning to the text of the statute, defendants' reading is implausible. The word "inoperative" suggests a lack of function; a current dictionary defines "inoperative" as "[n]ot working or functioning." American Heritage Dictionary of the English Language (4th ed. 2000). The context of the statute supports this interpretation. The word "inoperative" follows immediately after "abandoned, wrecked, [and] dismantled." Vehicles that are "wrecked" or "dismantled" are physically damaged. Similarly, the statute defines "abandoned" vehicles to be "in such inoperable or neglected condition that the owner's intention to relinquish all further rights or interests in it may be reasonably concluded"; i.e., obvious from their physical condition that they are not intended to be driven. In contrast, vehicles lacking valid registration may be mechanically flawless. Finally, the statute separately requires that an abated vehicle be "licensed or unlicensed," *and* that it be "inoperative," further suggesting that "inoperative" is a mechanical defect rather than a lack of appropriate licensing or registration. Defendants' proposed interpretation is thus at odds with the plain meaning of the statute. As indicated in Soffer, a municipality may choose to define "inoperative" to include unregistered vehicles, but the word standing alone does not suggest that meaning.

Defendants have presented no evidence that two of the vehicles—the 1952 Ford pickup and the 1956 Ford pickup—were mechanically inoperative at all. In addition, defendants have not presented any evidence that they believed the 1968 Ford Mustang to be mechanically inoperative at the time they towed it from plaintiff's property. The court therefore concludes as a matter of law that defendants were not authorized to abate plaintiff's vehicles.

### 2. Warrant Requirement

In order to resolve defendants' qualified immunity arguments, the court must separately consider whether, assuming *arguendo* that the abatements were authorized under the Concord

6

1 statute, towing the vehicles from plaintiff's driveway without a warrant was reasonable under the
2 Fourth Amendment.

3       The parties disagree as to the legal standard governing defendants' seizure of plaintiff's
4 vehicles.  Defendants argue that the reasonableness of the seizure depends only on plaintiff's
5 expectation of privacy in the area from which the vehicles were seized, citing Katz v. United States,
6 389 U.S. 347 (1967).  Plaintiff argues that the privacy determination set forth in Katz is irrelevant
7 because the conduct at issue in this lawsuit is a seizure, not a search.  Instead, plaintiff contends that
8 any seizure is *per se* unreasonable if conducted without a warrant, citing Miranda v. City of
9 Cornelius, 429 F.3d 858 (9th Cir. 2005); Soldal v. Cook County, 506 U.S. 56 (1992) and United
10 States v. Kaiyo Maru No. 53, 699 F.2d 989 (9th Cir. 1983).

11       Plaintiff's argument distinguishing searches from seizures is not an accurate statement of the
12 law, as the Fourth Amendment permits reasonable warrantless seizures as well as reasonable
13 warrantless searches, so long as a recognized exception to the warrant requirement applies.  See
14 G.M. Leasing Corp. v. United States, 429 U.S. 338, 351–52 (1977); Conner v. City of Santa Ana,
15 897 F.2d 1487 (9th Cir.), cert. denied, 498 U.S. 816 (1990).  The Ninth Circuit has held that an
16 otherwise lawful warrantless abatement does not violate the Fourth Amendment if the vehicle is
17 abated from "open fields" in which the owner does not have a reasonable expectation of privacy.
18 Schneider v. County of San Diego, 28 F.3d 89, 91–92 (1994), cert. denied, 513 U.S. 1155 (1995)
19 (noting that "any asserted expectation of privacy in open fields is not an expectation that society
20 recognizes as reasonable"); see also Feiner v. City of American Canyon, No. C 04-04472 WHA,
21 2005 WL 646061, at *2 (N.D. Cal. Mar. 8, 2005), vacated on other grounds, 2005 WL 1081459
22 (N.D. Cal. May 2, 2005) (Alsup, J.) (applying the Schneider standard to the abatement of hedges
located in the front yard of plaintiff's property).

23       Under the open fields doctrine, a court must determine whether the area of the seizure was
24 within the curtilage of the home.  Id. at *2–*3.  The Supreme Court provided a four-factor test for
25 determining the scope of the curtilage in United States v. Dunn, 480 U.S. 294 (1987):  (1) the nature
26 and use of the area; (2) the proximity of the area to the home; (3) whether the area is enclosed; (4)
27 whether steps were taken to protect the area from observation.  Dunn, 480 U.S. at 301–02.

28

7

In determining whether the driveway area at issue in this case was within the curtilage of plaintiff's home, it is helpful to examine the seizure in Conner. In Conner, the offending vehicles were removed from the plaintiffs' backyard, which was surrounded by a fence. Conner, 897 F.2d at 1489. In order to remove the vehicles, the police officers "broke down the fence surrounding the Conner property and removed two of the vehicles from the property." Id. The Conner court found that the seizure violated the plaintiffs' Fourth Amendment rights.

Here, the area in question is similar to the area in Conner with respect to the second Dunn factor—proximity to the home—but is far less private with respect to the remaining three factors. First, the "nature and use" of a street-facing driveway is different from an enclosed backyard in several respects. A driveway is visible from the street and from surrounding homes, as evidenced by the neighbor's complaint which set the events underlying this action in motion. Also, passing cars may pull into driveways in order to turn around. Second, the driveway at issue in this case was not enclosed. Third, plaintiff apparently took no steps to protect the cars on the driveway from observation.

Looking at the Dunn factors in combination, the proximity to plaintiff's house alone is insufficient to give rise to a reasonable expectation of privacy. Plaintiff's vehicles were indisputably on display for all the world to see. Nothing on plaintiff's driveway prevented members of the public from seeing the vehicles, or, indeed, from making physical contact with them. See also Miranda, 429 F.3d at 862 n.2 (noting that "[p]laintiffs concede that they lack a reasonable expectation of privacy" with respect to a vehicle parked on their driveway).

Miranda is not to the contrary. In Miranda, the Ninth Circuit considered whether a vehicle could be removed from the owner's driveway pursuant to the "community caretaking" doctrine, which permits offers to impound vehicles that "jeopardize public safety and the efficient movement of vehicular traffic." Id. at 864 (citing South Dakota v. Opperman, 428 U.S. 364, 368–69 (1976)). The court concluded that the community caretaking power did not allow the seizure of the vehicle safely parked on the driveway because the vehicle "was not creating any impediment to traffic or threatening pubic safety." Id. at 866. The issue in Miranda was thus not whether entry into the driveway was reasonable, but whether the seizure of a vehicle safely parked on private property was

8

1 authorized under the community caretaking power at all.  The plaintiffs in fact conceded that they
2 did not have a reasonable expectation of privacy as to their driveway.  Id. at 862 n.2.  Here, in
3 contrast, plaintiff does not challenge defendants' right to lawfully abate vehicles parked in a
4 driveway.  Plaintiff only challenges defendants' right to do so without a warrant.  Miranda is not
5 applicable.

6   Thus, the seizure did not violate plaintiff's Fourth Amendment rights solely by virtue of
7 where it took place.

### B. Qualified Immunity

In order to prevail on his claims against the individual city defendants, plaintiff must also establish that the city officials did not enjoy qualified immunity.  Qualified immunity shields public officials from liability for civil damages so long as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Even where the defendants move for summary judgment on qualified immunity grounds, the plaintiff bears the burden of proving that the right allegedly violated was clearly established at the time of the alleged misconduct.  See LSO, Ltd. v. Stroh, 205 F.3d 1146, 1157 (9th Cir. 2000).  If the court determines, as a matter of law, that the law was not clearly established, the inquiry ends and defendants are entitled to summary judgment.  See Romero v. Kitsap County, 931 F.2d 624, 629 (9th Cir. 1991) ("If the controlling law is not clearly established, a reasonable person would not be expected to know how to structure his conduct in order to avoid liability").

As discussed above, the only basis for finding the city defendants liable is their misinterpretation of the Concord ordinance.  Had the abatement been lawful under the ordinance, plaintiff's Fourth Amendment claim would fail as a matter of law because plaintiff did not enjoy a reasonable expectation of privacy in the area of his driveway.

Plaintiff has not provided any evidence or legal authority that the meaning of "inoperative" was clear prior to the challenged abatement.  Indeed, plaintiff's Due Process claims are based on his

9

argument that the term is unconstitutionally vague. Absent any showing of clearly established law, the city defendants are entitled to qualified immunity. The city defendants' motion for summary judgment on plaintiff's Fourth Amendment claims is therefore granted.

### C.   The Towing Company Defendants

The towing company defendants offer several arguments as to why they should not be liable for any violations of plaintiff's Fourth Amendment rights. Specifically, the towing company defendants argue that they are not state actors, that they are entitled to assert qualified immunity as a defense if they are found to be state actors, and that they are entitled to a "good faith" defense as a result of their obligation to tow vehicles at the request of the Concord police. The court considers each argument in turn.

First, towing companies are deemed to be state actors because they tow vehicles in response to orders by law enforcement officials:

> A police officer makes the initial determination that a car will be towed and summons the towing company. The towing company tows the vehicle only at the direction of the officer. The officer designates the garage to which the vehicle will be towed. The officer notifies the owner that his vehicle has been removed, the grounds for the action, and the place of storage. The towing company detains the vehicle and asserts the lien for towing and storage charges pursuant to a statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws. Thus, the private towing company is a "willful participant in a joint activity with the State or its agents," . . . and there is a "sufficiently close nexus between the State and the challenged action of the (towing company) so that the action of the latter may be fairly treated as that of the State itself."

Stypmann v. City and County of San Francisco, 557 F.2d 1338, 1341–42 (9th Cir. 1977); see also Goichman v. Rheuban Motors, Inc., 682 F.2d 1320, 1322 (9th Cir. 1982) ("a private towing company acting at the behest of a police officer and pursuant to a statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws, acts under color of state law for purposes of section 1983." (citing Stypmann)).

Second, private parties acting in concert with state authorities are not entitled to a defense of qualified immunity. Franklin v. Fox, 312 F.3d 423, 444 (9th Cir. 2002) ("private persons are not entitled to qualified immunity under § 1983.") (citing Wyatt v. Cole, 504 U.S. 158 (1992)).

10

The towing company defendant's third argument—that they are entitled to a "good faith" defense to liability—requires more scrutiny. Ninth Circuit law is unsettled as to whether there is a "good faith" exception to private party liability under section 1983. Compare Howerton v. Gabica, 708 F.2d 380, 385 n.10 (9th Cir. 1983) ("there is no good faith immunity under section 1983 for private parties who act under color of state law to deprive an individual of his or her constitutional rights") with Franklin, 312 F.3d at 444 (noting that the Supreme Court has never foreclosed the possibility of a good faith defense for private parties in section 1983 litigation).

Indeed, the Supreme Court has repeatedly suggested that such a defense might apply to private parties who become liable as a sole result of their compliance with an apparently valid law. In Lugar v. Edmondson Oil Co., the Court noted the potential injustice in holding "private individuals who innocently make use of seemingly valid state laws" responsible if the laws are later found to be unconstitutional. 457 U.S. 922, 942 n.23 (1982). The Court suggested that "this problem should be dealt with not by changing the character of the cause of action but by establishing an affirmative defense." Id.

In Wyatt, similarly, the Supreme Court noted that "we do not foreclose the possibility that private defendants faced with § 1983 liability under [Lugar] could be entitled to an affirmative defense based on good faith and/or probable cause or that § 1983 suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens." 504 U.S. at 169.

More recently, in Richardson v. McKnight, the Supreme Court directly considered whether guards employed by a private prison should be entitled to assert an affirmative defense akin to qualified immunity. 521 U.S. 399 (1997). The Court ultimately concluded that the guards should not, but expressly limited the holding to the facts of the case:

> we have answered the immunity question narrowly, in the context in which it arose. That context is one in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms.

Id. at 413. The Court also noted that there might be a separate "good faith" defense available to the guards:

11

> the Court of Appeals in this case limited its holding to the question of immunity. It said specifically that it "may be that the appropriate balance to be struck here is to permit the correctional officers to assert a good faith defense, rather than qualified immunity . . . . However, that issue is not before this Court in this interlocutory appeal." 88 F.3d, at 425. Like the Court in Wyatt, and the Court of Appeals in this case, we do not express a view on this last-mentioned question.

Id.

Other circuits have recognized a good faith defense in response to the Supreme Court's holding in Wyatt. The Fifth Circuit, on remand after the Supreme Court decision in Wyatt, held that "defendants, at least those invoking ex parte prejudgment statutes, should not be held liable under § 1983 absent a showing of malice and evidence that they either knew or should have known of the statute's constitutional infirmity." Wyatt v. Cole, 994 F.2d 1113, 1120 (5th Cir.), cert. denied, 510 U.S. 977 (1993). The Third Circuit, similarly, has held that "we believe private actors are entitled to a defense of subjective good faith." Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1277 (3d Cir. 1994). In Vector Research, Inc. v. Howard & Howard Attorneys P.C., the Sixth Circuit held that private investigators who carried out an unlawful search and seizure while accompanied by United States Marshals were entitled to assert a defense based on good faith. 76 F.3d 692, 698–99 (6th Cir. 1996). Finally, the Second Circuit held in Pinsky v. Duncan that a creditor who relied in good faith on the constitutionality of a state replevin law would not be liable under section 1983. 79 F.3d 306, 313 (2d Cir. 1996).

Judge Breyer, in this district, also recognized a good faith defense in Franklin v. Fox, No. C 97-2443, 2001 WL 114438, at *3–*4 (N.D. Cal. Jan. 22, 2001) (citing Wyatt, Jordan, Vector Research, and Pinsky). On appeal, the Ninth Circuit affirmed the district court's finding on other grounds, reserving judgment on whether a good faith defense exists. Franklin, 312 F.3d at 444 ("we need not reach the question of whether such a defense is available").

Many of the cases recognizing a good faith defense considered creditors who attempted to collect debts using state replevin procedures which were later found to be unconstitutional. See Wyatt, 994 F.2d at 1120; Jordan, 20 F.3d at 1276; Pinsky, 79 F.3d at 312. In each case, the creditor acted independently, without the prompting of state officials. As the Supreme Court indicated in Richardson, private defendants who act independently are arguably less entitled to protection from

12

liability than private entities "serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." 521 U.S. at 413.

Here, in contrast, it is not disputed that the towing companies acted solely at the behest of the city defendants. The facts surrounding the seizure in this case are thus similar to those considered in Vector Research, where private lawyers accompanied United States Marshals on a search which was later found to be illegal. Vector Research, 76 F.3d at 695. To the extent that older cases such as Howerton, Stypmann and Goichman might suggest a different result, they either did not squarely consider the possibility of a good faith defense or predate the Supreme Court's opinions in Wyatt and Richardson. The court therefore concludes that the towing companies are entitled to assert a defense to liability based on their good faith belief that they were towing plaintiff's vehicles in compliance with a valid order by city officials.

The Franklin court framed the precise contours of the good faith defense as follows. First, application of the defense turns on the defendant's subjective good faith. Franklin, 2001 WL 114438, at *5. Second, because good faith is an affirmative defense to liability, the Franklin court assumed that defendant bears the burden of proof. Id. at *5–*6.

The court finds that no material dispute exists as to whether the towing company defendants acted in subjective good faith. The towing company defendants offer detailed accounts of the city's Towing Services Program Rules & Regulations, which require participating towing companies to respond promptly to calls for service. Plaintiff does not disagree that the towing company defendants acted in response to a call from the city, or that the city defendants followed the usual procedure for towing vehicles declared to be a nuisance (aside from the city's failure to obtain a warrant). Moreover, as discussed above, the vehicles were removed from areas with no meaningful indicia of any expectation of privacy.

The only basis plaintiff has for arguing that the towing company defendants acted in subjective bad faith is that they should have known that mechanically operative vehicles did not fall under section 62-166. As noted above, however, the city defendants' interpretation of the statute, though flawed, did not violate clearly established federal law. The towing company defendants should not be held to a higher standard; indeed, other courts have noted that "private actors are not

13

charged with the same knowledge of the law as public officials." Wyatt, 994 F.2d at 1120 (citing Wyatt, 112 S. Ct. at 1837 (Kennedy, J., concurring)). There is simply no reasonable basis on the record before the court for concluding that the towing company defendants acted with subjective bad faith.

The court notes that its holding depends on the particular facts of this case, and does not announce a general rule that all private defendants—or, for that matter, all towing company defendants—are insulated from liability solely because they act at the direction of government officials. If the abatement law had been more clearly established, if the circumstances surrounding the abatement were more egregious, or if there were countervailing evidence of subjective bad faith on the part of the towing company defendants, the court's conclusion might be different. In the present case, however, plaintiff has provided no basis for questioning the towing company defendants' evidence in support of their claim of subjective good faith.

The towing company defendants' motions for summary judgment on plaintiff's Fourth Amendment claims are therefore granted.

II.     Due Process Claims

Plaintiff's due process claims have two alleged bases. First, plaintiff argues that he was denied any pre- or post-deprivation hearing to contest the abatement. Second, plaintiff argues that the abatement is unconstitutionally vague, either on its face or as applied in this case.

Plaintiff's first argument regarding the lack of a hearing is untenable. Defendant has submitted evidence, which plaintiff does not dispute, that plaintiff received three separate written notices prior to the abatements, and that the notices informed plaintiff of his right to a hearing in which to contest the grounds for the abatement. Plaintiff failed to avail himself of those hearings and cannot now complain that he was deprived of the opportunity to contest the merits of the city's position. Defendants' motion is therefore granted as it pertains to plaintiff's opportunity to be heard.

The court need not reach plaintiff's vagueness argument, which is moot in light of the finding that Concord's abatement statute does not apply to vehicles that are mechanically sound but unregistered.

14

III.     Retaliation Claim

Plaintiff's twelfth claim alleges that defendant Champagne illegally retaliated against plaintiff by obtaining an inspection warrant for plaintiff's property, which resulted in an inspection and ultimately led to the entry of a permanent injunction declaring certain aspects of plaintiff's property to be public nuisances. Defendants argue that Champagne is entitled to prosecutorial immunity with respect to the inspection.

Both federal and California law recognize broad immunity for state officials "who perform functions analogous to those of a prosecutor in initiating and pursuing civil and administrative enforcement proceedings." Pfeiffer v. Hartford Fire Ins. Co., 929 F.2d 1484, 1489 (10th Cir. 1991); see also Romano v. Bible, 169 F.3d 1182, 1186 (9th Cir.), cert. denied, 528 U.S. 816 (1999) ("Prosecutors are extended absolute immunity from damages when performing activities closely associated with the judicial process. . . . Quasi-prosecutorial immunity, however, does not attach to administrative or investigatory acts by prosecutors unrelated to their preparation for and initiation of prosecution." (internal citation omitted)); Cal. Govt. Code § 821.6 ("A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."). In Romano, Nevada gaming officials were accused of due process violations in connection with their investigation of a casino accused of defrauding gamblers. Romano, 169 F.3d at 1184–85. The investigation led to the revocation of the casino's license, which caused financial harm to the owners. Id. at 1185. The court found that the gaming officials were entitled to absolute prosecutorial immunity, as "[t]he Gaming Control Board conducts investigations and decides whether to file complaints with the Commission disciplining a licensee. . . . In so doing, it acts much like a prosecutor." Id. at 1187.

Here, similarly, plaintiff's retaliation claim against Champagne is based on her investigation of alleged violations of city ordinances on plaintiff's property. Champagne conducted the investigation in order to decide whether to seek abatement of the violations. In response to Champagne's investigation, the city ultimately filed a civil suit against plaintiff and obtained an order declaring the conditions on plaintiff's property to be a nuisance. Under these circumstances,

15

which closely parallel those discussed in Romano, Champagne is entitled to prosecutorial immunity. Defendants' motion for summary judgment with respect to plaintiff's retaliation claim is therefore granted.

IV.     State Law Claims

Plaintiff concedes that his state law tort claims against the city defendants are barred as a result of plaintiff's failure to comply with California's Tort Claims Act. See Cal. Govt. Code § 810 et seq. The city defendants' motion for summary judgment on plaintiff's state law claims is therefore granted.

As to the towing company defendants, the court will consider plaintiff's state law conversion and intentional of infliction of emotional distress claims separately.

A.     Conversion

The towing company defendants argue that they cannot be liable for conversion because they towed plaintiff's vehicles in response to apparently valid commands by city officials. In support of this argument, the towing company defendants cite Sokol v. Public Utilities Commission, 65 Cal. 2d 247 (1966). In Sokol, the defendant telephone company disconnected plaintiff's phone service at the request of the California Public Utilities Commission, which believed plaintiff to be using the telephones for illegal gambling activities. Id. at 249–50. Plaintiff subsequently prevailed in establishing that no illegal activity was taking place. Id. at 250. Plaintiff then filed a lawsuit against the telephone company, seeking damages arising from the interruption in service. The California Supreme Court found that the telephone company could not be found liable "for complying with a mandatory order of the Public Utilities Commission valid upon its face, if that order is later found to be unconstitutional." Id. at 257. The court found that to hold otherwise would "impose upon the utility the investigative functions of a law enforcement agency and the decision-making duty of a judicial tribunal." Id.

Plaintiff distinguishes Sokol on the grounds that it did not consider a conversion claim. According to plaintiff, conversion is a strict liability offense, so the towing companies' belief that

16

they were acting in accordance with the law is irrelevant. The rule set forth in Sokol, however, appears to be rooted in notions of sound public policy as much as in notions of fairness: "A contrary rule would not only be inequitable but would discourage cooperation with law enforcement agencies." Sokol, 65 Cal. 2d at 257–58. Here, as in Sokol, the towing companies acted in response to a request from a law enforcement agency. The towing companies' motion for summary judgment on plaintiff's conversion claim is therefore granted.

B.  Intentional Infliction of Emotional Distress

Defendant Byrich moves for summary judgment on plaintiff's IIED claim based on plaintiff's failure to allege or provide evidence demonstrating that Byrich or its employees had any negative interaction with plaintiff. Defendants Rubio and Batterton argue that their acts cannot be viewed as "outrageous" as a matter of law.

Plaintiff responds that he presented evidence of the following acts committed by defendant Byrich: (1) Byrich sold one of plaintiff's vehicles after removing it from plaintiff's driveway; (2) in order to remove plaintiff's 1968 Mustang, Byrich first dragged another of plaintiff's vehicles across the driveway, thereby causing the vehicle substantial damage. With respect to defendants Rubio and Batterton, plaintiff notes that Rubio's driver yelled obscenities at plaintiff and threatened to run plaintiff over if plaintiff interfered with the removal of plaintiff's vehicles. Plaintiff further argues that the acts of the towing company defendants was more offensive when carried out under the supervision of the police. See Pulver v. Avco Fin. Servs., 182 Cal. App. 3d 622, 637 (1986) ("[b]ehavior may be considered outrageous if a defendant . . . abuses a relation or position which gives him power to damage the plaintiff's interest.").

In order to prevail on his claims of intentional infliction of emotional distress, plaintiff must prove

> (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress;
> (2) the plaintiff's suffering severe or extreme emotional distress; and
> (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct.

Simo v. Union of Needletrades, 316 F.3d 974, 992, amended on other grounds by 322 F.3d 602 (9th

17

Cir.), cert. denied, 540 U.S. 873 (2003). The Ninth Circuit has defined "extreme and outrageous conduct" to be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." Id. (citing Saridakis v. United Airlines, 166 F.3d 1272, 1278 (9th Cir. 1999)).

Giving full credence to plaintiff's recitation of the facts surrounding the two abatements, the court finds that the alleged conduct is not "extreme and outrageous" as required under California law. With respect to the shouted obscenities, "[o]rdinarily mere insulting language, without more, does not constitute outrageous conduct." Kiseskey v. Carpenters' Trust for So. Cal., 144 Cal. App. 3d 222, 230 (1983). Plaintiff's allegation that one of the defendants threatened to run plaintiff down if he did not move out of the way is arguably more serious, but plaintiff has not offered any rational basis for viewing the threat as credible, particularly in light of the presence of Concord police officers at the scene of the abatement. Finally, with respect to the damage to plaintiff's truck and the subsequent sale of one of plaintiff's vehicles, plaintiff had received multiple abatement notices and had already experienced the abatement of the 1952 pickup truck prior to the second abatement. The damage to plaintiff's property and plaintiff's loss of his vehicle were neither shocking nor unexpected.

Moreover, plaintiff does not provide any evidence of "extreme emotional distress." "Severe emotional distress means emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." Simo, 316 F.3d at 992 (citing Kiseskey). In Simo, the Ninth Circuit rejected claims of intentional infliction of emotional distress where the plaintiffs alleged only that they felt threatened or scared, or were emotionally damaged in a general sense. Id. Here, plaintiff makes no concrete allegations whatsoever as to the effect defendants' conduct had on him. Plaintiff has thus not carried his burden of proof on the elements of his IIED claim.

The towing company defendants' motions for summary judgment on plaintiff's IIED claims are therefore granted.

18

CONCLUSION

For the above reasons the court hereby GRANTS in full defendants' motions for summary judgment and DENIES in full plaintiff's cross-motions for summary judgment. The clerk shall close the file.

IT IS SO ORDERED.

Date: June 2, 2006

_____
MARILYN HALL PATEL
United States District Judge
Northern District of California

19

ENDNOTES

1. Defendant Steven Syputa is incorrectly named on the caption as Steven Syputo.

2. Defendant Rhodes is now deceased and is no longer a party to this litigation.

3. Unless otherwise noted, background facts are taken from the declarations submitted with the parties' briefs.

4. The City of Concord entered into a separate settlement agreement with plaintiff and is no longer involved in this lawsuit.